## UNITED STATES v. HARRISON.

No. 12354.

United States Court of Appeals
Ninth Circuit.

March 24, 1950.

Frank J. Hennessy, U. S. Atty., Edgar R. Bonsall, Asst. U. S. Atty., San Francisco, Cal. (Lloyd E. Gowen, Asst. Adjudications, Officer, Imm. & Nat. Service, San Francisco, Cal., on the brief), for appellant.

Gladstein, Andersen, Resner & Sawyer, Ewing Sibbett, San Francisco, Cal., for appellee.

Before MATHEWS and BONE, Circuit Judges, and MATHES, District Judge.

BONE, Circuit Judge.

In December, 1946, appellee filed a petition for naturalization under the Nationali-
ty Act of 1940, 8 U.S.C.A. § 701. The member of the Immigration and Naturalization Service designated to conduct the preliminary hearing on this petition, § 733, filed findings and a recommendation urging denial of the petition on the ground that appellee had failed to establish good moral character. After a hearing the district court disapproved this recommendation and entered an order admitting appellee to citizenship (with a change of name). The United States appealed.

The substantial issue presented on this appeal is simple. Did the trial court abuse its discretion in holding that appellee had established that he was a person of good moral character?

Appellee was born in Ireland in 1910 and entered the United States in 1940 as a deserting seaman and thereupon adopted a new name. He secured employment with a San Francisco firm and has continued in the employment of this firm except during a period of about 3½ years during which he served in the armed forces. He was injured in the service as a result of an explosion during an air attack and spent considerable time in hospitals before being returned to active military service. He received an honorable discharge from the army.

Appellee was married in Ireland in 1935 and his wife and two children, born of this marriage, a girl 13 and a boy 11, reside in Ireland. He left Ireland in 1937 and has not seen his wife and children since. Despite the fact that this marriage was not dissolved, appellee (in October, 1945) while in the army, went through a form of marriage in Louisiana with one Naomi Clark, an American citizen, and he continued to live with Naomi Clark after his discharge from the army (on November 24, 1945) and until she left San Francisco in October 1946. She subsequently secured an annulment of this illegal marriage.

Receipt of certain information led officials of the Immigration Service to interview appellee on July 29, 1946 at which time he appears to have revealed a part of his true history but withheld information concerning his marriage and family in Ire-

land. He then maintained that his only marriage was to Naomi Clark.

On September 17, 1946 before an officer of the Immigration Service, appellee subscribed and swore to a statement of facts set forth on an official general information form, these facts being supplied by him in connection with and in support of his pending application for a suspension of deportation. His statement averred the date of his marriage to Naomi Clark, asserted that he had not been previously married and that he had no children. Before signing and swearing to the truth of the facts set forth in the statement appellee was warned by the attesting officer concerning the penalty for making a false statement.

Later and on October 14, 1946, appellee executed another sworn statement before an officer of the Immigration Service in which he admitted the fact of his first marriage, stating that while he had not received any word from Ireland that his marriage had been terminated he had "heard" from a seaman who had been in Belfast (who was not "sure" about the matter) that his wife had remarried. He also stated that he had signed a waiver by which he permitted Naomi Clark to petition for an annulment of the marriage, and acknowledged that he had not been capable on October 8, 1945 of entering into a valid marriage with her. He further testified that he had claimed birth in New York in his Selective Service registration form so that he would not be deported.

After filing the December, 1946 petition for naturalization, appellee made another sworn statement (on May 1, 1947) before an officer of the Immigration Service. From the findings and recommendations of the designated examiner of the Immigration Service (submitted to the court at the final hearing on the petition) it appears that in the sworn statement of May 1, 1947 appellee set forth that the Naomi Clark marriage had been annulled; that he had made the false statements in the affidavit of September 17, 1946 because he did not think that he would ever be found out; that he

had no intention of deceiving the government but he did not want to hurt Naomi Clark by telling her the truth; that after coming to America he did not communicate with his family in Ireland and did not send anything to them for their support; that two letters (presented to the officer) gave indication that his wife had consulted attorneys in Ireland with a view of filing a petition for a divorce; that he had signed letters indicating that he was willing to relinquish his interest in certain real estate in Ireland on which there was a mortgage; that during his absence from Ireland his wife had lived with her mother and had received whatever income was derived from rentals of this property.

At the formal court hearing on the petition for naturalization appellee testified in substance (among other matters) that he "did not write to Ireland" before marrying Naomi Clark to ascertain if his wife was living; that after eighteen months in this country he quit sending support money for his children in Ireland since he "was going on his own * * * and never going back there any more"; that he knew that this determination did not relieve him of the duty to support his children; that he left Ireland in 1937; that he was "going to sea" when he married in Ireland which caused "certain difficulties between him and his wife"; that he was "not at home" but aboard ship for three years and his wife told him (in effect) that if he didn't quit going to sea she would leave him,[1] that five or six years after he left Ireland he hired a San Francisco lawyer to arrange to transfer the title to the (mortgaged) home in Ireland to his wife; that his wife did not obtain a divorce from him but would allow him to secure a divorce; and he could not say whether she has any funds of her own.

At the formal hearing on the petition counsel for appellee argued to the court that this was a case of a man who was unhappy in his homeland and in his home and wanted to come here "and start a new life, which he did"; that (in this new life in America) appellee should not have commit-

---

1. He apparently abandoned all desire to "go to sea" after he came to this country.

ted the crimes of bigamy and perjury; that appellee had recanted of his perjurious statement "within less than a month";[2] that the *only* wrong of any substantiality in this case was the failure to support the children but he explained why this was; that appellee had attended to deeding over the house in Ireland to "them" and "they" have collected rent on it. The final argument was that appellee's working record and military service entitled him to be admitted.

We cannot accept counsel's appraisal of appellee's conduct since that would require us to wholly ignore the legal and moral significance of two crimes committed after he made his home in this country (both being felonies under California law) and the further offense of wife desertion and non-support of children of a tender age. There is entire absence of merit in a novel contention advanced by appellee that courts have recently adopted "a new liberality of attitude and view point" toward such offenses and this shift of judicial opinion should lead us to approve appellee's admission to citizenship. We are aware that some recent decisions apparently hold that proof of certain types of questionable conduct does not require a denial of citizenship. However, we are not called upon to approve or reject the views expressed in those decisions since, in any event, none of them deals with a situation comparable to the one in the case at bar. Therefore a review of those decisions would not be helpful here.

Appellee would have us proclaim a new judicial standard of "good moral character" which in practical effect would blot from the applicable law a critical and significant definition relating to character which imposes an important restriction upon the granting of citizenship. Congress set the standard of character in cases of this kind and it certainly did not intend to suggest to courts that they regard the commission of the crimes of perjury and bigamy by alien applicants for citizenship as evidence of their good moral character.

Another reason thought to possess merit is advanced by appellee as a basis for granting citizenship in this case. It rests upon the assumption that despite appellee's offenses his derelictions should be overlooked or condoned for the reason that (aside from a record of military service) it is our duty to recognize that courts are now functioning in some sort of a "new era" the mores of which dictate "an attitude of great liberality" toward felonious offenses of aliens seeking American citizenship. The inference embodied in this concept of law is that such a "liberal" judicial viewpoint is a sign of "progress" in the law. The specific argument is that our decision should conform to "the mores of the times" and follow this "increasingly liberal trend."

Appellee epitomizes his contentions by assuring us that the ultimate and decisive test to be applied in this case is "whether the moral feelings now prevalent generally in this country would be outraged by the *conduct* in question." This test is not an irrational one and since it does no violence to the spirit of the law we see no reason for rejecting it. We apply it to the facts of this case and hold that the moral feelings now prevalent generally in this country *would* be outraged by the immoral and criminal *conduct* of appellee. Should this court express a contrary conclusion it would be a sad reflection on the mores of our times and a deplorable comment on moral standards existing in the United States. We adhere to the view that the moral climate of America does not encourage crime and criminals.

A final consideration remains. Appellee argues that an honorable discharge from the army is prima facie evidence of good moral character. Assuming the validity of this contention it requires no argument to demonstrate that such a fact cannot be so conclusive in its evidentiary effect as to outweigh, override and destroy the effect of other evidence which clearly establishes a course of conduct characterized by criminal activities of a serious character. The

2. The hearing on the petition for naturalization was held prior to our decision in Llanos-Senarillos v. United States, 9 Cir., 177 F.2d 164, 165. That decision destroys the force of the argument that a later recantation of the perjury (of September 17, 1946) blots out or condones that offense.

984

latter showing may completely negative the idea that the author of the criminal act *is* a person of good moral character, and we think that such is the effect of the evidence respecting appellee's conduct. Any other conclusion would imply that citizenship should be granted as a matter of course to all aliens who served in our armed. forces regardless of the presence or absence of good moral character. This is not the law.

It may well be that in the exercise of a sound discretion in passing upon a petition for naturalization, a court could, with propriety, disregard evidence of some minor offenses not indicative of moral depravity where the record failed to disclose the commission of serious offenses. But we are not here called upon to consider such a case. The record before us establishes as a matter of law that appellee is not a person of good moral character.

The order admitting appellee to citizenship is reversed and the cause remanded with directions to deny appellee's petition.